# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LEO L. DURAN,

    Plaintiff,

v.                                                                              CIV No. 01-203 JP/LFG

CORRECTIONAL MEDICAL
SERVICES,

    Defendant.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

    This is a *pro se, in forma pauperis* civil rights actions brought under 42 U.S.C. § 1983. Plaintiff Leo L. Duran ("Duran") originally filed this action against a number of corrections officials[2] and the Correctional Medical Services ("CMS"), alleging that defendants were deliberately indifferent to his medical needs after he sustained a broken ankle while catching a pop fly in a softball game in the recreation yard at the Penitentiary of New Mexico.

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

[2] The Court dismissed all of the individual defendants, along with Duran's claim for failure to provide an adequate law library, in a Memorandum Opinion and Order, filed April 26, 2001. [Doc. 6.] The Court also granted Defendant's motion to strike an amended complaint filed by Plaintiff and denied a subsequent request to amend the complaint. [Docs. 19, 27.]

The Court ordered remaining Defendant CMS to submit a Martinez Report[3] on the incidents alleged in Duran's complaint. The parties were notified that the Martinez Report could be used in deciding whether to grant summary judgment on Duran's claims. CMS submitted the report [Doc. 21] and Duran filed a response [Doc. 23]. The matter is now ripe for resolution on summary judgment.

The Court may grant summary judgment, under Rule 56(c) of the Federal Rules of Civil Procedure, if the pleadings, depositions, answers to interrogatories and admissions or affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The opposing party must be given notice and an opportunity to respond, as provided in Rule 56. Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991).

CMS, having filed a Martinez Report, is in the same position as a movant for summary judgment and therefore, carries the burden of establishing that there is no genuine issue of material fact for trial. CMS may satisfy its burden by showing an absence of evidence to support Duran's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986). Once the movant meets its burden, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on a material matter. Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The party opposing the motion may not rest on pleadings, mere argument, or contention but must set forth specific facts through admissible evidence, showing there is a genuine issue for trial as to those dispositive matters for which he carries the burden of proof. If he cannot make such a showing, summary judgment is appropriate. Celotex, 477 U.S. at 324.

---

[3] The Court may order the defendant in a case brought by a prisoner proceeding *pro se* to submit a special report referred to as a Martinez Report. The report is an investigation of the incident which is the basis of the lawsuit. *See* Martinez v. Aaron, 570 F.2d 317 (10th Cir. 1978).

Duran alleges that CMS delayed in performing an x-ray of his ankle and in placing a cast on his ankle, which resulted in unnecessary pain as well as "permanent pain and problems with his ankle." [Doc. 1 at pp. 5-8.] Duran also alleges that the cast placed on his ankle was inadequate and that his overall medical treatment with respect to the ankle injury violated constitutional guarantees against cruel and unusual punishment under the Eighth Amendment.[4] The Martinez Report and CMS's response to Duran's grievance confirm that, due to "an error in paperwork," there was a five-day delay in performing an x-ray on Duran's ankle. Notwithstanding this short delay, Duran was given crutches on the day of his injury, directed not to place any weight on the right ankle, told to elevate it, given ice packs and prescribed Motrin and Tylenol. The medical records indicate that Duran was provided extensive medical treatment from that day forward, although admittedly, the medical staff initially believed his ankle was sprained and the x-ray was inadvertently delayed. The records, some of which Duran disputes, also show that Duran was non-compliant in caring for his ankle.

After carefully considering the pertinent law, pleadings and exhibits, the Martinez Report, and Duran's 42-page response to the Martinez Report, with multiple attachments, the Court finds, as a matter of law, that CMS's treatment of Duran's condition did not rise to the level of a constitutional violation. Therefore, summary judgment in favor of CMS is appropriate, and Duran's complaint will be dismissed with prejudice.

---

[4]Duran's Complaint identifies four separate claims, although claims one and four both allege Eighth Amendment violations related to medical care. Claims two and three allege that Duran was denied access to the courts as a result of Defendant's failure to provide a law library or legal assistance. Those claims (two and three) were dismissed in the April 26, 2001 Memorandum Opinion and Order [Doc. 6].

## Factual Background

In the early evening of July 19, 1998, Duran was playing in a softball tournament at the Penitentiary of New Mexico (South Facility). He fell in a "faulty sprinkler hole over grown with grass and foliage" while catching a pop fly and injured his right ankle. [Doc. 23 at 1.] Duran was seen at the prison's infirmary at 6:45 p.m. on July 19 and given Ace bandages, ice packs, instructed to elevate his ankle and not place weight on it. He was scheduled for x-rays the next day. [Doc. 21, Ex. A-1.] According to Duran, he was given crutches also. [Doc. 1.]

The next morning at 9 a.m., Duran was examined by Erin Fire, a physician's assistant. Duran was walking with crutches then, told to use an ace wrap, and to rest and elevate his ankle. The medical record shows that an x-ray was ordered. [Doc. 21, Ex. A-2.] Duran believed his ankle was broken and contends that Ms. Fire thought it was only a sprain or torn ligaments.

On July 21, 1998, Duran complained that he could not take the Motrin because it upset his stomach. He was given a choice of Indocin, Naprosyn or Motrin. On July 24, 1998, Duran arrived at the infirmary using crutches. He was given a posterior fiberglass splint and instructed to wear it at all times. He again was told to continue using crutches, given passes to get ice, and instructed to elevate the ankle. [Doc. 21, Ex. A-4; Doc. 23, at 5.] Duran alleges that he was transported to the North Facility for x-rays on July 24th and that he was improperly placed in leg restraints before the trip. The inpatient infirmary medical record on that day shows that the x-ray was not done as originally ordered but that it was done on July 24, 1998. Duran's posterior splint was drying at that point, and his crutches were in the room. The physician, Dr. Penn, noted on the record that Duran was smoking in the infirmary and walking across the room without crutches. He was instructed not

to smoke and not to place weight on the ankle. [Ex. A-6.] He denies walking around and states he was leaning against a wall.

The results of the July 24 x-ray showed a "spiral fracture of the distal fibula" with "minimal displacement," although apparently this finding was not reported or communicated to Duran until July 28 or 30. [Ex. A-7; Doc. 23 at 3.] Duran claims that on July 25 an unknown male physician came into his room in the infirmary and told him to throw away the splint he was using because his foot needed exercise rather than a splint. [Doc. 23 at 6.] Duran states this same doctor returned to examine his ankle on July 26 and moved his foot jerking it to the left "real hard." Duran claims he hit the doctor in the arm by reflex. [Doc. 23 at 6.] There are no medical records recording either of these visits. On July 27, 1998, he was discharged from the infirmary and instructed to use the crutches for five days and then to gradually begin walking. [Ex. A-8.]

On July 28, 1998, Duran was scheduled to go to the infirmary and at first refused to go without crutches. He was provided with crutches but then proceeded to come to the infirmary without crutches or his splint. He claims that a nurse came to his cell, saw him walking on his foot and told him for the first time that he had a fracture and should not place any weight on the ankle for four weeks from the date of the injury. [Doc. 21 at 9.] Duran told the nurse that he was walking on his foot based on what he was told at the infirmary. An examination by Ms. Fire revealed minimal swelling and increased range of motion. Duran again was counseled about non-compliance and told to use his crutches, elevate the ankle, and apply ice. The posterior splint was reapplied and he was told to leave it in place. Duran told Fire that the ankle still hurt, but "not like before." [Ex. A-9; Doc. 21 at 11.]

5

Although Duran claims the conversation with the nurse about the fracture occurred on July 28, the July 30 medical record appears to document this same conversation. Duran believes this date is mistaken. [Ex. A-10; Doc. 21 at 11.] A follow up appointment was scheduled for Duran to see Dr. Penn on August 5, 1998.

On August 4, 1998, Duran visited the clinic and was seen by Dr. Penn. The medical record shows that he "has not [been] putting weight on [it] except 'when it hurts' then he stands on it for a few minutes." [Ex. A-11.] The record also documents that he has a posterior splint but does not use it always. "Currently he came to clinic not wearing splint." Dr. Penn discussed with Dr. Hurley in orthopedics whether to use a cast or splint. Dr. Hurley said either would be fine but Dr. Penn preferred the cast for increased mobility. Duran contends that he went to the clinic that day for "a proper cast" and that the one provided by Fire was for temporary use and did not provide him with enough stability "if [he] was forced to defend [him]self against the prison gang. . . ." Duran states that he arrived at the clinic on crutches with the splint on contrary to the information in the medical record. [Doc. 21 at 12.]

On August 5, 1998, Dr. Hurley placed a short leg cast on Duran to remain on his leg for eight weeks. [Ex. A-12.] Duran claims that he was transported again in belly chains and leg restraints and was not allowed to use crutches. On August 10, 1998, Duran had a follow-up appointment in the clinic. The medical record shows he was wearing the fiberglass short leg cast and a cast boot, but that he wanted pain medications. He refused the medications offered. [Doc. A-13.]

One day later, on August 11, 1998, the nurse doing the medication run documented that Duran showed him his cast that now had a small hole in it near the heel of the foot. Duran told the nurse that he had poked the hole in it to let water out. There also was a crack in the cast near the

hole. The nurse commented that the cast appeared unstable and scheduled him for an appointment that same day. [Ex. A-15.] Duran stated that the plastic bag given to him had a hole in it that allowed the cast to get wet and that he placed a "pea size hole" in the cast to let it drain. [Ex. 21 at 13.]

Ms. Fire saw Duran at the infirmary that day, placed a new cast on the ankle and instructed him to use the cast boot. He refused a walking heel. He also was told to access "medical" immediately if the cast was too tight or causing pain. [Ex. A-15.] Duran claims that the new cast was a "very sloppy job and that when he complained to Fire, she asked him if he wanted a "teddybear" which embarrassed him. [Ex. 21 at 15.]

On August 12, Duran returned to have his cast checked. Fire documented that he was angry and belligerent. She stated that she offered to re-cast his ankle and that there were nurses present to witness this exchange. Duran refused a new cast and would not sign the "refusal form." [Ex. A-16; Ex. A-17.] Duran claims he told Fire that he would like anyone but her to re-do the cast because she had done everything wrong since July 20th. There is another "refusal form" dated August 14, that again is witnessed by two nurses and states that Duran refused to have his cast checked or changed. [Ex. A-18.] Duran admits that he again refused to have Fire re-do his cast, but that he believed someone else was going to re-cast his ankle. [Ex. 21 at 17.]

On September 1, 1998, he returned to the infirmary for his cast to be checked. The record documents that he "self-removed the cast on August 12, 1998." [Ex. A-19.] He also said that he had a splint in his unit but left it there. He was walking in high-top boots with ace wrap around his ankle. He refused a cast. Fire encouraged compliance with wearing a splint. Duran asserts that he went to the infirmary that day for his annual TB shot and was being transferred to Southern N.M.

7

Correctional Facility later in the day. He claims he did not see Fire that day or speak to her. He explains "for the record" that he "removed the sloppy cast with nailclippers on 8/14/98." [Doc. 21 at 18-19.]

On September 2, 1998, he was seen in the Southern N.M. Correctional Facility's clinic. He was observed wearing an ace wrap on his right ankle and scheduled for an x-ray on September 9, 1998. [Ex. A-20.] He claims he did not have access to his splint then because it was packed away until inventoried after his move. [Ex. 21 at 20.] The September 9 x-ray showed the fracture and minimal healing at that time. "Position and alignment are acceptable." [Ex. A-22.] Duran claims that Physician's Assistant Greenwald gave him a temporary splint that day that was "very flexible and no way made for the purpose of a longterm splint." The temporary splint, according to Duran, was to be used until Greenwald could provide a plaster and cloth splint. [Doc. 21 at 21.]

On September 16, Duran came to the clinic on crutches with his splint in tact. [Ex. A-24.] The plaster splint was applied on that day. Medical records document that Duran had previously removed his cast and splint. [Ex. A-22.] Duran was counseled about partial weight bearing and to stop smoking. [Ex. A-24.] He claims that Greenwald told him she did not know how to place a certain type of cast on him and asked him not to file a grievance on her if it was not applied correctly. [Ex. 21 at 22.]

Medical records show that Greenwald observed Duran on September 28 walking without crutches or the splint. "He removed the new splint again." [Ex. A-22.] Duran denies that Greenwald saw him without crutches or the splint. [Doc. 21 at 23.] Duran requested that his ankle be checked on October 7 and was scheduled for an appointment with Greenwald on October 9 but did not show up. [Ex. A-26.] Duran asserts that he learned Greenwald was not in on October 9 and decided there

8

was no reason to see another health care provider who would just pass on his complaint. [Ex. 21 at 23.]

On October 21, 1998, Duran's ankle again was x-rayed. The results show the fracture was healing and there was no change in position or alignment. [Ex. A-27.] The medical record on that date indicates Duran was not wearing any type of support. [Ex. A-28.] Duran claims that the previous splint lasted shortly because of its construction out of cloth and plaster. He "left the old useless 'sugarsplint' with the R.N. and continued using [his] old fiberglass splint given by PAC Erin Fire on 7/28/98." [Ex. 21 at 24.]

On October 28, Dr. Dhillon was doing rounds when Duran told him that his fracture had not healed and that he needed a cast. [Ex. A-29.] On November 4, 1998, Dr. Dhillon reviewed the chart and the x-rays, noting that casts and splints had been provided in the past and that Duran had removed them. He scheduled an appointment with Duran. Duran claims that he was transferred on November 6, 1998 to P.N.M. North in Santa Fe before he could keep the scheduled appointment. [Ex. 21 at 25.]

On November 10, 1998, Duran was seen at the clinic by Physician's Assistant Barnhardt. The record documents that Duran stated he was noncompliant with wearing the cast because he could not defend himself with a cast on. He also complained that the current splint was rubbing on the fractured side. He stated that he was compliant for about three weeks. He was scheduled for another x-ray and was instructed to wear the new splint provided to him that day at all times. [Ex. A-32.]

An x-ray taken November 13, 1998 shows that there was "some interval healing but no significant repair at the fracture site." "There is some periosteal new bone formation seen." The conclusion was "partial healing." [Ex. A-33.] A medical record, dated November 20, 1998,

9

documents that Duran stated the fracture was improved and that he did not feel any pain at that time. The record also reflects that Duran was "up and walking . . . without limping." [Ex. A-34.] Duran denies that he was seen on November 20, 1998 and that he made the comments contained in the record.

The medical record, dated December 2, 1998 shows that Duran has been reported by nursing staff to be non-compliant with the splint. Duran purportedly told the staff that he wears the splint when he is outside his cell but not when he is in his cell. He was instructed about the importance of wearing the splint. [Ex. A-35.] Duran denies that he made the comments reflected in the record. He claims he told Barnhardt that he wore the splint all day everywhere he went except to the shower, and that she told him to continue to wear the splint but that he did not need a cast. [Ex. 21 at 29-30.]

On January 6, 1999, he reported to Barnhardt that his right ankle felt "all right," "no numbness, no tingles." [Ex. A-38.] A January 8, 1999 x-ray shows "almost complete healing" of Duran's fracture. [Ex. A-36.] On January 11, 1999, he was issued a cast boot, a fiberglass ankle splint and 2 ace wraps and clasps. [Ex. A-37.] The x-ray findings from January 8 were discussed with Duran on January 21, 1999. Barnhardt and two other medical care providers conversed with Duran for about 25 minutes. The record notes that he had a history of noncompliance with using a cast and that his continued tobacco use led to delayed healing at the fracture cite. The record indicates that Duran was frustrated and said that cold weather was making it hurt worse and that he wanted a new splint. A new posterior splint was applied and another x-ray was scheduled. [Ex. A-39.]

A February 16 x-ray indicates solid fusion at the fracture site and progressive healing. [Ex. A-40.] Duran states that the x-ray technician told him the x-ray looked good and that his ankle was

finally healed. He requested boots for additional ankle support. Medical records, dated February 25 and March 1, further document his request for special boots. The March 1, 1999 record shows that the boots are not medically indicated. [Ex. A-42.]

Duran was transferred to Western New Mexico Correctional Facility on about April 23, 1999 and requested another x-ray. [Ex. 21 at 32.] The April 27, 1999 x-ray report indicates that no old films were available for comparison but that there was some suggestion of delayed healing or nonunion. [Ex. A-43.] A medical record, dated April 30, 1999, documents that Duran complained of "a little ankle pain when it's cold, otherwise ok." "Now able to walk and do everything OK . . ." The record states that Duran felt he could do road crew work. [Ex. A-44.] Duran complains that he did not receive the results of the April 27 x-ray but that the doctor reassured him on April 30 that the x-ray was OK. He seems to imply the doctor could not have known the results of the April 27 x-ray on April 30. [Ex. 21 at 34-35.]

A little over a year later, on May 23, 2000, Duran visited the clinic about his ankle and other matters. He did not have pain or instability but complained about a popping sound. Duran had a full range of motion and was assured that the popping sound was not pathologic. He was offered another x-ray but refused it due to concern about exposure to radiation. [Ex. A-45.]

On July 12, 2000, he requested a foot specialist and complained of numbness on the top of his foot. The record shows that his ankle was better but that he was worried about numbness. The physician's assistant described him as being very aggressive and adamant that he needed to see a specialist. [Ex. A-47.] On July 24, 2000, he complained that every time he did his exercises, his foot went numb near the ankle. The physician documented that the foot and ankle architecture were

11

normal, that there was no swelling, the gait was normal and there was no sensory deficit on exam. [Ex. A-47.]

On April 27, 2001, Duran complained he had ankle pain when he was doing the "jumping jacks." He was issued an elastic ankle support. [Ex. A-48, A-49.] Although apparently able to engage in most, if not all activities, Duran's primary complaint appears to be that he was not fully and timely informed of the results from the April 27, 1999 x-ray. He believes he should have been given therapy based on his interpretation of that x-ray report that the ankle was not healed. A careful review of that medical report indicates that the radiologist had difficulty in seeing the fracture on the x-ray films. The physician's remarks that there was a "suggestion" of "some degree" of delayed healing or nonunion appear inconclusive. The radiologist then recommended clinical correlation. [Ex. A-43.] It should be noted that the radiologist did not have any prior x-rays for comparison purposes at that time. Duran was examined subsequent to that x-ray and the records indicate that he had little ankle pain and was able to perform most activities. He initially refused a subsequent x-ray. In July 2000, Dr. Penn then concluded that no further evaluation or x-rays were indicated. [Ex. A-47.]

## Discussion

The issue the Court must decide is whether CMS violated Duran's Eighth Amendment rights by deliberate indifference to a serious condition. The Complaint and other pleadings submitted by Duran assert that the five-day delay in performing an x-ray, the delay in providing a cast to Duran, and alleged "sloppy" medical treatment provided by certain physicians' assistants constitute failure to provide proper and timely medical attention in violation of Duran's Eighth Amendment rights.

12

Prisoners have an Eighth Amendment right to adequate medical care. Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285 (1976).

> [E]lementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical 'torture or a lingering death,' the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.

Id. When prisoners allege inadequate or delayed medical care violated their Eighth Amendment rights, they must show that prison officials were "deliberately indifferent to the serious medical needs of prisoners in their custody." Oxendine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001) (*citing* Estelle, 429 U.S. at 104-06)). An objective and a subjective component must be established to prove "deliberate indifference":

> The objective component is met if the deprivation is sufficiently serious. A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety.

Deherrera v. Kropinak, 3 Fed.Appx 797, 2001 WL 81999 at *2 (10th Cir. N.M. Jan. 31, 2001) (*citing* Sealock v. Colo., 218 F.3d 1205, 1209 (10th Cir. 2000)).

As set forth above, the inmate may satisfy the objective component by showing that a sufficiently serious condition was diagnosed by a physician and required treatment. On at least one occasion, the Tenth Circuit has further commented that "[t]he objective component requires an 'extreme deprivation' denying a 'minimal civilized measure of life's necessities.'" Rashad v. Doughty,

4 Fed. Appx 558, 561, 2001 WL 68708 at *1 (10th Cir. Jan. 29, 2001) (*citing* Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995 (1992)). In addition, with respect to claims that medical treatment was delayed, the inmate must demonstrate that the delay resulted in "substantial harm." Sealock, 218 F.3d at 1210. "Delays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems. Prison officials may be liable for delays resulting in lifelong handicaps or permanent losses." Gresham v. Flowers, 208 F.3d 226 (Table, Text in Westlaw), 2000 WL 192926 at *2 (10th Cir. Feb. 17, 2000) (internal citations and quotation marks omitted).

With respect to the subjective element, the inmate must allege facts supporting an inference that Defendants knew about and disregarded "a substantial risk of harm to his health or safety." Oxendine, 241 F.3d at 1277. Deliberate indifference may be demonstrated under circumstances when prison officials prevent an inmate from receiving treatment by medical personnel capable of evaluating the need for treatment. Id. at 1279 (internal citation omitted). However, an inmate is not entitled to his choice of a medical care provider, nor does he state a constitutional violation when he disagrees with medical treatment or the diagnosis. Oxendine, 241 F.3d at 1277 n.7; Coppinger v. Townsend, 398 F.2d 392, 394 (10th Cir. 1968).

Moreover, a mere delay in treatment, without more, does not amount to deliberate indifference. "Although a delay in treatment is a relevant consideration, . . ., the ultimate finding of deliberate indifference necessarily requires findings that the prison official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and that he drew that inference." Garrett v. Stratman, 254 F.3d 946, 950 n. 4 (10th Cir. 2001) (internal citation omitted).

Finally, it is well established that "[n]egligence or even medical malpractice is not enough to constitute deliberate indifference" "merely because the victim is a prisoner." Id. (*citing* Estelle, 429 U.S. at 106) "A medical decision not to order an x-ray, or like measure, does not represent cruel and unusual punishment. At most it is medical malpractice." Estelle, 429 U.S. at 107. Accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment do not comprise a medical wrong under the Eighth Amendment. Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759 (1981). *See also* Gresham, 2000 WL 192926 at *2 (allegations of medical negligence or malpractice do not rise to the level of deliberate indifference, particularly where defendants engaged in ongoing, comprehensive, good faith efforts to treat the inmate's pain and ailments).

The Court has liberally construed Duran's complaint and pleadings as it must in a *pro se* case. However, Duran simply cannot meet the requirements of his Eighth Amendment claim that CMS was "deliberately indifferent" to a serious medical need. First, it is doubtful that Duran has met the objective component to succeed with his claim. While according him every benefit of the doubt that his need for an immediate x-ray and cast for his ankle was "sufficiently serious,"[5] Duran has not provided evidence that these delays resulted in "substantial harm" to him. Almost immediately upon being injured, Duran was seen by medical staff, given crutches and told to keep off his right leg. The x-ray was scheduled for the following day and ultimately was delayed by only five days. That delay appeared to be accidental or inadvertent due to a mix-up. In addition, Duran was given a fiberglass

---

[5]It is questionable whether such delays in care, under these circumstances, amount to an "extreme deprivation" denying a "minimal civilized measure of life's necessities." Hudson, 503 U.S. at 9.

splint within five days of his injury, although he did not receive a short leg cast until about seventeen days after his injury, subsequent to the x-ray results.

At worst, CMS's early impressions that Duran's ankle was sprained, rather than fractured, and the short delay in performing an x-ray of the ankle constituted medical negligence, if that. Certainly, Duran's medical condition was not a life-threatening situation that went untreated. He repeatedly and regularly was seen by health care providers. He was treated, examined, x-rayed, prescribed medicines, and given multiple splints and casts. The record demonstrates that Duran was consistently and comprehensively treated for his ankle condition for two to three years after the injury.

Nor has Duran provided evidence that the short delays exacerbated his medical problems, resulted in lifelong handicaps or created permanent losses. Although he alleges in his Complaint that he endured unnecessary pain as well as now having "permanent pain and problems with his ankle," his recorded comments to medical health care providers and his medical records are to the contrary. For example, the April 27, 2001 medical record, which appears to be the most recent, states that the only pain he has is when he does "jumping jacks." [Ex. A-48.] Similarly, about nine months earlier, he complained only that his foot went numb when he was doing his exercises. That exam in July 2000 showed no swelling, a normal gait, and no sensory deficit. [Ex. A-47.] In May 2000, he reported that he "could make his ankle pop" which concerned him. However, he reported no pain and no instability. [Ex. A-45.] He was offered an x-ray at this point and refused it. In April 1999, he complained only of a "little ankle pain" when it was cold. Otherwise, he reported his ankle was ok. At that time, he felt he could do road crew work. [Ex. A-44.]

Duran does not appear to dispute the comments documented on these four medical records. His main bone of contention appears to be that the April 1999 x-ray results were not reported promptly to him and that he did not receive physical therapy due to the radiologist's comments that there was "some suggestion of some degree" of delayed healing or nonunion. However, none of the clinical correlation (after the x-ray) indicated any real problem with Duran's ankle. These facts are not sufficient to demonstrate that Duran incurred a lifelong handicap or permanent loss due to failures by CMS.

In Hanson v. Smith, the Tenth Circuit addressed a very similar case. The prisoner alleged that he broke his leg during recreation on August 27, 1992 and was not properly attended to by medical staff who waited too long to diagnose and treat the fracture. Hanson 9 F.3d 1557 (Table, Text in Westlaw), 1993 WL 499831 at *1 (10th Cir. Dec. 6, 1993). That prisoner also contended that the case was removed too soon to allow for full healing. The initial diagnosis was a muscle strain rather than a fracture. The inmate was given pain medication and was bandage wrapped. An x-ray was not available until September 1, approximately five days after the injury. The x-ray indicated a non-displaced fracture. His leg then was placed in a short cast. After the cast was removed, further x-rays showed his leg was healing. The Court, with little analysis, decided that the plaintiff had failed to allege acts or omissions sufficiently harmful to demonstrate deliberate indifference to the inmate's medical needs. Id. at *2. *See also* Lopez v. Hacker, 1996 WL 502086, No. 95-3462 JWL at *3 (D. Kan. Aug. 22, 1996) (x-ray taken of inmate's sports injury about 11 days after the event; defendant's mere failure to recognize the inmate's broken bone did not support a constitutional claim, nor did delay in obtaining an x-ray result in substantial harm); Gresham, 208 F.3d 226 at *2 (delay in setting fracture, during which time inmate was given pain medication and ice packs, did not demonstrate

17

substantial harm); Deherrera, 3 Fed. Appx. at 800-01 (reaching similar result); *compare* Oxendine, 241 F.3d at 1278 (inmate's blackening and necrifying tissue was "sufficiently serious" to be obvious to even a lay person as to the need for medical attention and failure to obtain specialist until after a substantial portion of the finger had been lost to decay established the objective element of the test).

The second reason Duran's Eighth Amendment claim must fail is because he has not presented evidence to demonstrate "deliberate indifference" on the part of CMS medical staff. There simply are no facts to support an inference or finding that CMS knew of and disregarded an excessive risk to Duran's health or safety. To the contrary, the medical records clearly show that Duran was treated repeatedly in regard to his ankle complaints and that he was prescribed pain medications as well as splints, ace bandages, casts, and ice packs. The records show that Duran was instructed on numerous occasions how to care for his ankle. Moreover, there is evidence that Duran was non-compliant regarding instructions to stay off his foot and to use the splint. Duran does not always admit that he was non-compliant, but on some occasions he does, even though he provides excuses for why he was standing on his foot, removing (sloppy) splints or poking a hole in his cast. If anyone disregarded risks to Duran's health, it may have been Duran himself.

Finally, there is no evidence that CMS disregarded an "excessive risk" to Duran's health. Although the April 1999 x-ray may have raised some question as to whether Duran's ankle was completely healed, Duran commented to CMS that his ankle was feeling all right with the exception of when he did certain exercises. In addition, later medical appointments and exams confirmed that the ankle no longer needed treatment.

**Conclusion**

Summary judgment should be entered in favor of Defendant CMS because there is no genuine issue of material fact for trial. The order directing submission of a Martinez Report [Doc. 19] gave the parties notice that the Report might be used in deciding whether to grant summary judgment on Duran's claims. *See* Durtsche v. American Colloid Co., 958 F.2d 1007, 1009 n.1 (10th Cir. 1992) (*quoting* Celotex, 477 U.S. at 326 ("district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*.") The Court finds that the medical care Duran received from CMS did not violate constitutional standards.

**Recommended Disposition**

That summary judgment be entered in favor of Defendant CMS and that Duran's Complaint be dismissed, with prejudice.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge